IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE EGGERT AGENCY, INC., et al.,
    Plaintiffs,

v.

NA MANAGEMENT CORPORATION, et al.,
    Defendants.

Case No. 2:07-cv-1011
JUDGE EDMUND A. SARGUS, JR.
MAGISTRATE JUDGE TERENCE P. KEMP

## OPINION AND ORDER

Plaintiffs Eggert Agency Inc., Mount Carmel Health System, James R. Eggert, and Gregory R. Nickell bring this action against Defendants NA Management Corporation, North American Benefits Agency Inc., and Meritain Health Inc. (collectively, "Defendant")[1] for damages related to a stock purchase agreement (the "SPA") dated September 9, 2003 pursuant to which Defendant purchased the stock of E-V Benefits Management Network, Inc. ("E-V") from Eggert Agency Inc. and Mount Carmel Health System. (Ans. Ex. A-1.)

This matter is before the Court for consideration of Defendant's Motion for Summary Judgment. (Document 40.) For the reasons that follow, the Motion is **GRANTED** in part and **DENIED** in part.

I. **Background**

A detailed description of the allegations and procedural background in this matter is contained in this Court's August 12, 2008 Opinion and Order granting in part and denying in part Defendant's Partial Motion to Dismiss. (Op. and Order Aug. 12, 2008, 1–4, 2008 U.S. Dist. LEXIS 90830, *1–5 (the "2008 Opinion").)

---

[1] Following the transaction at issue, NA Management Corporation and North American Benefits Agency Inc. were merged out of existence into Meritain Health Inc.

To summarize, pursuant to the SPA, Defendant purchased the stock of E-V from Eggert Agency Inc. and Mount Carmel Health System. The purchase price included payments based partially on the net revenues earned from E-V's current and certain prospective clients ("Revenue" as defined in the SPA) during the three-year period following the close of the deal (the "Revenue Period"). (SPA at 39, Answer Ex. 4)

When the revenue upon which the payments were based did not satisfy Plaintiffs' expectations, they sued on multiple counts. Defendant moved for dismissal of several counts under Rule 12(b)(6), and the Court granted Defendant's motion in part in its 2008 Opinion. Following the Court's 2008 Opinion, three counts remain: Count One for breach of contract, Count Five for deceit and misrepresentation, and Count Six for fraud. The Court will refer to Count One as the "contract claim" and Counts Five and Six collectively as the "fraud claim."

## II. Standard of Review

Defendant has moved for summary judgment under Civil Procedure Rule 56. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum*, 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.*, 489 F.3d at 279–80 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

III. **Analysis**

  A. **Contract Claim**

  Plaintiffs seek to prove that Defendant breached the SPA by showing that Defendant (1) failed to comply with the express provisions of the contract, (2) failed to comply with the implied covenants of good faith and fair dealing, or (3) breached its duty to expend reasonable efforts to create profits and revenues.

  *(1) Express Provisions of the Contract*

  In its definition of "Revenue," the SPA mandates "*material compliance*" with the following requirements: Defendant must "[r]etain an E-V marketing staff to be designated as the E-V Marketing Resource, reporting to [Defendant's] Executive Vice President, Marketing & Sales" and must "[i]ntroduce established marketing (i.e., broker/consultant) relationships in the Greater Columbus, Greater Toledo and other appropriate areas to the E-V Marketing personnel, as appropriate." (SPA at 39, Answer Ex. 4) (emphasis added).)

  Donald Baker, the founder, chairman, and chief executive officer of Defendant at the time of the SPA negotiations, stated that the above obligations were in effect throughout the entire three-year Revenue Period. (Baker Dep. 10, 52, 156 (agreeing that the obligations had a three-year duration).)

  It is undisputed that Defendant (a) failed to retain an E-V marketing staff *without interruption* for the duration of the Revenue Period and (b) failed to introduce established marketing relationships to E-V personnel *on a consistent basis* for the duration of the Revenue Period. Plaintiffs Eggert and Nickell testified that the requirements were substantially unfulfilled.

3

(i) <u>Retention of E-V Marketing Staff</u>. Mr. Baker testified that "there probably were interruptions" in Defendant's retention of an A-V marketing staff, and conceded that Defendant's "marketing efforts had not been particularly good." (Baker Dep. 172–73, 202, 205.) Mr. Eggert, on the other hand, stated in his declaration that Defendant retained a single E-V marketing staff person for only nine months, and none by January 2005. (Eggert Decl. ¶ 23.) Construing the evidence and drawing all reasonable inferences in Plaintiff's favor, the Court finds that there is a genuine question of material fact as to whether Defendant materially complied the SPA's requirement that Defendant retain an E-V marketing staff.

(ii) <u>Introduction of Marketing Relationships</u>. Mr. Baker testified that Defendant introduced E-V representatives to established marketing relationships during the Revenue Period, but not on a consistent basis. (Baker Dep. 161–62.) Mr. Eggert testified that he could not recall that Defendant introduced or established marketing relationships in the Columbus or Toledo areas. (Eggert Dep. 173; *see also* Eggert Decl. ¶ 22 ("I do not believe that [Defendant] introduced a single marketing relationship (broker/consultant) to me or any other E-V associate.").) Mr. Nickell testified that Defendant made unsustained attempts to establish marketing relationships in the Columbus area. (Nickell Dep. 163.) Construing the evidence and drawing all reasonable inferences in Plaintiff's favor, the Court finds that there is a genuine question of material fact as to whether Defendant materially complied with this requirement of the SPA.

### *(2) Implied Covenants of Good Faith and Fair Dealing*

Plaintiffs allege that Defendant breached the implied covenants of good faith and fair dealing when it "gutted and shuttered E-V's business, failed to live up to its marketing obligations and thwarted E-V's efforts to develop clients." (Compl. ¶ 28, Pls.' Mem. 14.)

4

If a contract is "silent, as opposed to ambiguous, with respect to a particular matter," then the parties "are required to use good faith to fill the gap." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 764 (6th Cir. 2008) (applying Ohio law) (citing *Burlington Res. Oil & Gas Co. v. Cox*, 133 Ohio App. 3d 543 (Oh. Ct. App. 1999); *Myers v. Evergreen Land Dev. Ltd.*, case 07-MA-123, 2008 Ohio 1062, ¶ 28 (Oh. Ct. App. March 6, 2008)).

The good faith requirement is "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Savedoff*, 524 F.3d at 764 (citing *Ed Schory & Sons v. Francis*, 75 Ohio St. 3d 433 (Oh. 1996)). The duty of good faith depends upon the contract language, "which leads to an evaluation of reasonable expectations of the parties." *Savedoff*, 524 F.3d at 764 (emphasis added) (citing *Fultz & Thatcher v. Burrows Group Corp.*, case CA2005-11-126, 2006 Ohio 7041, ¶ 34 (Oh. Ct. App. Dec. 28, 2006)).

Defendant correctly notes that a covenant of good faith and fair dealing will not be implied to override express contract terms. (Def.'s Reply 9 (citing *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003)).) Defendant also contends that an implied covenant of good faith and fair dealing would override the specific requirements set forth in the SPA's definition of "Revenue." (*Id.* at 9.) The Court disagrees, and finds that such an implied covenant of good faith and fair dealing applies to several issues on which the SPA is silent.

The SPA does not address several issues at the heart of this case. In its Motion, Defendant concedes that "there are no contractual provisions that govern" staff retention, treatment of E-V employees, brand retention, maintaining E-V as an entity, maintaining a central Ohio presence, maintaining the Columbus office, systems capability standards, systems transitions standards, customer service standards, claim turnaround standards, client system

access standards, and interactive website standards. (Mot. 9.) Defendant further concedes in its Reply that "no contractual provision governs the closing of the Columbus office," which "falls outside the express terms of the written contract." (Def.'s Reply 3 n.6.)

On the other hand, Plaintiffs present evidence that Defendant "gutted and then shuttered E-V's operations, ruining E-V's ability to retain existing revenues and generate new revenues." (Pls.' Mem. 10.) Mr. Eggert stated in his declaration that two or three waves of layoffs occurred between the sale in September 2003 and the end of that year, and that by early 2005, less than one and a half years after the sale, there were only two or three employees remaining in the E-V office. (Eggert Decl. ¶ 20; *but see* Smith Dep. 97 (recalling that roughly 25 employees were working at the Columbus office when it was closed).) Defendant closed E-V's Columbus office in February 2005, less than half-way through the Revenue Period. (*See* Smith Dep. 97; Eggert Decl. ¶ 28.)

Defendant allegedly took these actions although, as Mr. Baker stated in his deposition, "a presence in Columbus was essential for the development of further business in that area and preserving the account base in that area." (Baker Dep. 187–90.) Mr. Baker conceded that this was particularly important because, as discussed below, those clients had just gone through "a rather arduous technology conversion." (*Id.* at 188.)[2]

Plaintiffs also present evidence that Defendant prematurely converted E-V's clients to Defendant's technological platform, resulting in what Mr. Baker characterized as an "often times traumatizing experience" for customers. (Eggert Decl. ¶ 24; Baker Dep. 153; Squilanti Dep. 23 (the conversion "did not go well and created a lot of . . . client dissatisfaction").)

---

[2] Mr. Baker also stated that during conversations regarding the closing of the Columbus office, he "brought the fact that [Defendant] had obligations to [E-V] to [Defendant's] attention, that [Defendant] be cognizant that there is a requirement for sales support and so on in [the SPA]." (Baker Dep. 209–10.)

6

Finally, Mr. Eggert testified that Defendant made "at least one effort . . . that prevented [Mr. Eggert] from cultivating additional revenue that could have been pretty significant." (Eggert Dep. 136–37.) Specifically, according to Mr. Eggert, he and Chuck Bates (then E-V's marketing director) had scheduled a meeting with Cheryl Tidwell (Defendant's Executive Vice President of Marketing & Sales) and a potential client regarding the Summit County employees benefit plan. For reasons unexplained, prior to the meeting, Ms. Tidwell allegedly informed Mr. Eggert that Mr. Baker had instructed her to "keep Eggert and Bates out of Summit County." (*Id.* at 137; Eggert Decl. ¶ 21.)

Construing the evidence and drawing all reasonable inferences in Plaintiff's favor, the Court finds that there is a genuine question of material fact as to whether Defendant breached an implied covenant of good faith and fair dealing.

### *(3)    Duty to Expend Reasonable Efforts*

In its 2008 Opinion, the Court concluded that "Defendant's promise to pay revenue during the period preceding the three-year anniversary of the agreement included a promise to use reasonable, or best efforts to bring profits and revenues into existence." (2008 Opinion at 9–10, 2008 U.S. Dist. Lexis 90830 at *16.) The Supreme Court of Ohio has held that "a contractual provision which gives a party the exclusive right to market a product on behalf of another imposes upon that party a duty to employ reasonable efforts to generate sales of the product." *Ill. Controls v. Langham*, 70 Ohio St. 3d 512, 520 (Oh. 1994).[3] Here, payouts to Plaintiffs were largely contingent on Defendant's generation of revenue from operating E-V's

---

[3] Defendant asserts that "even if *Illinois Controls* supported superimposing a best-efforts standard in this case . . . [it] does not support introducing parol evidence of the parties' negotiations" because the contract terms in *Illinois Controls* were ambiguous and the SPA terms are not. (Defs.' Reply 11.) The Court need not reach this issue, however, because the Court does not rely on parol evidence in concluding that Defendant had a duty to use reasonable efforts to bring revenues into existence.

7

business during the Revenue Period, obligating Defendant to use reasonable efforts to generate revenue.

While Defendant is correct that parties may by contract modify or eliminate the implied duty to use reasonable efforts (Def.'s Reply 9), the Court finds that the parties did not do so in this case. While "[t]here can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself" (*Id.* at 10 (citing *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St. 3d 270, 274 (Oh. 1999))), it is undisputed that there are "no contractual provisions" that govern numerous issues, as discussed above. To the extent that Defendant's obligations were not specifically set forth in the SPA, it was obligated to use reasonable efforts to generate revenue.

In support of their allegations, Plaintiffs have presented evidence that Defendant precipitously reduced E-V's staff, closed the Columbus office during the first half of the Revenue Period, and made a "traumatizing" technological transition affecting all customer accounts, all as discussed above. Further, Mr. Baker conceded that Defendant's "marketing efforts had not been particularly good." (Baker Dep. 202, 205.) The materiality of Defendant's apparently lackluster marketing efforts is apparent when viewed in light of Mr. Baker's testimony that a robust marketing and sales function is "absolutely" essential to the growth and success of such a business. (*Id.* at 65; *see also* Smith Dep. 35–37.)

Construing the evidence and drawing all reasonable inferences in Plaintiff's favor, the Court finds that there is a genuine question of material fact as to whether Defendant breached its obligation to use reasonable efforts to generate revenue.

Defendant's Motion is denied as to Plaintiffs' contract claim.[4]

---

[4] Defendant contends that Plaintiffs have not submitted sufficient evidence of damages. (Def.'s Reply 12–14.) Damages are a necessary element to a contract claim. *Mikulski v. Centerior Energy Corp.*, 501

8

## B. Fraud Claim

Plaintiffs allege that Defendant made repeated misrepresentations to induce Plaintiffs to enter into the SPA, causing Plaintiffs harm. To establish a fraud claim, a plaintiff must prove six elements:

> (a) a representation . . . (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 505 (6th Cir. 2003) (citing *Carpenter v. Scherer-Mountain Ins. Agency*, 135 Ohio App. 3d. 316 (Oh. Ct. App. 1999)).

Under Ohio law, whether a defendant charged with fraud believed his representations to be true "must be gathered from his conduct and declarations, and all those circumstances which go to show motives." *McCracken v. West*, 17 Ohio 16, 24–25 (Oh. 1848); *see also* 50 OH. JUR. FRAUD AND DECEIT § 86. Moreover, because "intent is rarely provable by direct evidence, such intent may be inferred from the 'totality of the circumstances.'" *Davis v. Sun Ref. & Mktg. Co.*, 109 Ohio App. 3d 42, 56 (Oh. Ct. App. 1996) (citing *Klapchar v. Dunbarton Properties, Ltd.*, case CA-8521, 1991 Ohio App. Lexis 5509 at *3 (Oh. Ct. App. 1991); *Fulton v. Aszman*, 4 Ohio App. 3d 64, 72 (Oh. Ct. App. 1982)); *see also* 50 OH. JUR. FRAUD AND DECEIT § 86 (citing *Leal v. Holtvogt*, 123 Ohio App. 3d 51, 76 (Oh. Ct. App. 1998).

---

F.3d 555, 563 (6th Cir. 2007) ("Under Ohio law, the elements of a common law breach of contract are (1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant unlawfully failed to fulfill his obligations, and (4) that damages resulted from this failure.") (citing *Lawrence v. Lorain County Cmty. Coll.*, 127 Ohio App. 3d 546, 549 (Ohio App. 1998)). However, to survive summary judgment, a plaintiff need not establish damages "with reasonable certainty" (Def.'s Reply 12), but must rather provide evidence sufficient to establish a genuine question of material fact as to whether the plaintiff was damaged by the defendant's alleged breach. While Plaintiffs will have a higher burden at trial, the Court finds that they have met their burden at this stage by submitting expert testimony on the issue. (*See* McLellan Op., Ex. 8 to Pls.' Mem.; McLellan Dep.)

9

Plaintiffs allege that Defendant repeatedly represented to Plaintiffs during the spring and summer of 2003 in Delaware County and elsewhere that "after the Stock Purchase the staff and business of E-V would be retained, nurtured and improved in Central Ohio." (Compl. ¶ 40.) Plaintiffs present the following evidence to support their fraud claim.

At his deposition, Mr. Eggert stated that Defendant represented that E-V "would continue as an entity" and that Defendant "would provide marketing resources so that the company could grow." (Eggert Dep. 98; *see also id.* at 87, 94, 96, 152.) According to Mr. Eggert, Defendant "had promised us . . . that we would continue to have the presence in central Ohio and northwest Ohio in the markets that we served." (*Id.* at 152.) He stated that, "based on what Mr. Baker and Mr. Dewsnup [Defendant's negotiators] told me, E-V would . . . do the same things as we had always done, taking the advantage of some other things that [Defendant] would bring to us." (*Id.* at 94.) Further, "Mr. Dewsnup and Mr. Baker assured us" that "our employees would be treated properly and . . . that the strong reputation that we had built in the community would be upheld." (*Id.* at 96.)

Mr. Eggert's declaration provides more detail. He stated that shortly before a letter of intent was executed in July 2003, he met with Mr. Dewsnup and Mr. Baker in Columbus. At that meeting, Mr. Dewsnup indicated that Mr. Eggert's agreed salary must be reduced from $159,000 to $50,000, but proposed that Mr. Eggert would have the opportunity to share in E-V's growth through revenue-based payouts. (Eggert Decl. ¶ 14.) Although Mr. Eggert was "certainly not pleased with the proposed salary reduction," he avers that Mr. Baker and Mr. Dewsnup "continued to reiterate [at the meeting] that they were committed to E-V's growth, that they would continue to operate E-V as a separate, Columbus-based entity and that significant dedicated marketing resources would be provided to E-V." Mr. Eggert declared that "[b]ased on

10

their continued representations, I trusted that we would be fairly compensated through the purchase payout . . . Messrs. Baker's and Dewsnup's assurances to grow and improve E-V's business led me to believe that our customers and employees would be properly care for. Accordingly, I signed the letter of intent." (*Id.* at ¶ 15.) According to Mr. Eggert, over the following two months, Defendant "continued to assure us that [Defendant] was committed to E-V's growth, as well as to maintaining our Columbus presence and high levels of customer service." (*Id.* at ¶ 16.)

Mr. Nickell testified that as the parties discussed the importance of continuity in client service, they discussed that "part of that continuity would be [that client accounts] would be serviced by the same people, who understood the accounts both from an account-management perspective as well as claims processing, so it was always discussed as though those people would continue to service those accounts." (Nickell Dep. 44.) According to Mr. Nickell, the parties also discussed that E-V's name would be "E-V Benefits Management, Inc., a NABN Company," so that Plaintiffs "had every reason to believe that E-V Benefits would continue in . . . essentially, its same manner." (*Id.* at 85–86.)

Regarding the parties' technology, according to Mr. Eggert's declaration, Defendant represented through Mr. Dewsnup that "E-V's clients would be converted" to Defendant's technological platform "one at a time," and "assured" Mr. Eggert and his staff "that a client would not be converted . . . until the client's benefit plan could be administered exactly as it had been administered prior to the sale, which would be critical to maintaining our high levels of customer service." (Eggert Decl. ¶16.) Mr. Nickell also testified that Defendant gave "assurances" "that they didn't see anything that, if they weren't already doing, couldn't be

11

administered," and that Defendant "could produce similar results" compared to E-V's platform. (Nickell Dep. 92–93.)

Plaintiffs allege that Defendant did not intend to comply with the above representations at the time they were made. (Compl. ¶ 44.) To support this allegation, Plaintiffs point to the deposition testimony of Mr. Baker and Mr. Dewsnup. When asked whether Defendant intended during negotiations to grow the Central Ohio and Toledo market, he replied "[w]e did not have any specific initiatives targeted to those areas. We had a general marketing development plan to increase the awareness in a lot of different markets . . . including Columbus and Toledo." (Baker Dep. 76.) When asked, "you did not have any specific intention of growing the business in [the Central Ohio and Toledo] markets?", Mr. Baker responded:

> [W]herever it came from, you know, great, I didn't care. I just wanted to get the growth out of our business, and if we ran into resistance, for example, in Columbus because of one reason or the other . . . then we would focus more . . . in other areas where we got a friendlier reception.

(*Id.* at 77.) Mr. Baker further testified that "we thought that the existence of the [E-V] brand in [Columbus and Toledo] had some natural advantages for us to build on," and he "would envision that if we have a presence and a client base and a referral base, that we would logically want to build on that." (*Id.* at 77–78.)

When Mr. Dewsnup was asked whether it was his intention was that E-V would continue in Columbus, he responded:

> In a modified structure, yes. As—we needed the name to continue on, of course. That was—we had no definite plans as far as after so many years or whatever it would change, but the idea was to put [Defendant] and E-V together and make us more of a combined operation.

(Dewsnup Dep. 136.) Plaintiffs also point to the timing of the E-V staff layoffs and office closure as indicative of Defendant's intent at the time of the alleged representations. (*See* Pls.' Mem. 18–19.)

Plaintiffs have submitted sufficient evidence to establish a genuine question of material fact as to whether Defendant made representations that turned out to be untrue.[5] Plaintiffs have not, however, presented sufficient evidence to establish a genuine question of material fact as to Defendant's intent regarding the truth of its statements and its intent to mislead Plaintiffs.

Such intent may be inferred from the totality of the circumstances, including Defendant's conduct and declarations. *McCracken*, 17 Ohio at 24–25; *Davis*, 109 Ohio App. 3d at 56. The only such circumstances alleged by Plaintiffs, however, relate to Defendant's failure to abide by the alleged representations. While intent can be inferred from the circumstances, "the mere proof of nonperformance does not prove a lack of intent to perform." *Captiva, Inc. v. VIZ Commc'ns, Inc.*, 85 Fed. Appx. 501 (6th Cir. 2004) (quoting *Wall v. Firelands Radiology, Inc.*, 106 Ohio App. 3d 313 (Oh. Ct. App. 1995)). As the Sixth Circuit has noted:

> In any breach of contract case where one party refused to continue performance, the other party can always allege that the non-performing party entered into the contract with the specific intent to discontinue performance prior to the completion of the contract. Such an allegation, however, is merely speculation on the part of the aggrieved party, and the plaintiff cannot simply rely on the defendants' repudiation of the contract as evidence of a preconceived plan to defraud.

*Schneider v. Qualters*, case 87-3405, 1988 U.S. App. LEXIS 9960, *19–20 (6th Cir. 1988).

Plaintiff's only other evidence of Defendant's intent is the deposition testimony of Messrs. Baker and Dewsnup, in which they state that Defendant intended to grow the combined companies in general and believed that the Columbus office had advantages, but was not committed to the Columbus office indefinitely. Such testimony does not support a finding that Defendant intended not to perform according to the alleged representations or that Defendant intended to mislead Plaintiffs.

---

[5] As to the materiality of the misrepresentations, the Court notes that if certain promises were material to the transaction, and Plaintiffs wished to ensure their enforceability, they could have included them in the language of the contract.

The Court finds that Plaintiffs have not submitted sufficient evidence regarding Defendant's intent. Therefore, the Court need not address the other elements of fraud.

Construing all of the evidence presented and drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiffs have not submitted sufficient evidence to establish a genuine question of material fact as to Plaintiff's fraud claim. Defendant's Motion is therefore granted as to that claim.

## IV. Conclusion

For the reasons discussed above, the Court hereby **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's fraud claim and **DENIES** Defendant's Motion as to Plaintiff's contract claim. (Document 40.)

**IT IS SO ORDERED.**

8-4-2009
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**