IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE EGGERT AGENCY, INC.,
et al.,

          Plaintiffs,

          v.

NA MANAGEMENT
CORPORATION, et al.,

          Defendants.

Case No. 2:07-cv-1011

JUDGE EDMUND A. SARGUS, JR.

## OPINION AND ORDER

Plaintiffs Eggert Agency Inc., Mount Carmel Health System, James R. Eggert, and Gregory R. Nickell bring this action against Defendants NA Management Corporation, North American Benefits Agency Inc., and Meritain Health Inc. (collectively, "Defendant") for alleged breaches of a Share Purchase Agreement dated September 9, 2003 pursuant to which Defendant purchased the stock of E-V Benefits Management Network, Inc. from Eggert Agency Inc. and Mount Carmel Health System. (Ans. Ex. A-1.)

**I.**     **Background**

This case involves a dispute between third-party administrator companies, referred to as "TPAs," which are in the business of administering employer-sponsored health benefit plans. (Tr. 27.)

In September 2003, E-V Benefits Management Network, Inc. ("E-V") was a Columbus-based TPA which served various employers in central Ohio. (Tr. 61.) Plaintiff Eggert Agency Inc. ("Eggert Agency") was E-V's majority shareholder, and Mount Carmel Health System ("Mount Carmel") was its only other shareholder. (Tr. 62; Joint Ex. 7 at page 1 of Share Purchase Agreement.)

Plaintiff James R. Eggert was the sole owner/shareholder of Eggert Agency and Chairman and Chief Executive Officer of E-V. (Tr. 332, 434.) Plaintiff Gregory R. Nickell was the Executive Vice President of E-V, "responsible for essentially all the operational areas in the company with the exception of marketing and sales," including the call center, claims processing, information technology, and accounting. (Tr. 84–85.) Eggert and Nickell were also beneficiaries under E-V's Incentive Growth Plan pursuant to which they were entitled to compensation in the event of a change in control of E-V. (Tr. 270, 359; Joint Ex. 2.)

On September 9, 2003, E-V was acquired by Defendant North American Benefits Network, Inc. ("NABN"), a TPA headquartered in Cleveland, Ohio, pursuant to a Share Purchase Agreement (the "SPA"). (Tr. 248–49; Joint Ex. 7 (the SPA).) The purchase price included payments based partially on the net revenue earned from E-V's current and certain prospective clients ("Revenue") during the three-year period following the close of the deal: September 9, 2003 to September 9, 2006 (the "Revenue Period"). (SPA at 39.) At the time of the acquisition, Ronald K. Dewsnup was NABN's President (Dewsnup Dep. 29, 40), and Donald Baker was NABN's Chairman, Chief Executive Officer, Chief Financial Officer, and Treasurer (Tr. 248).

In December of 2004, NABN was acquired by or merged into a company called North American Health Plans. (Tr. 38, 282.) The surviving entity, Defendant Meritain Health, Inc. ("Meritain"), is TPA based in New York. (Tr. 28, 38.) The parties agree that Defendant Meritain, as the surviving entity, is liable for the obligations of all of the named defendants.

Plaintiffs' payments under the SPA depended on Revenue attributed to E-V during the Revenue Period. Plaintiffs initially sued Defendant on multiple counts; all that remains is a claim for breach of contract. Plaintiffs essentially contend that Defendant committed acts and

omissions, in breach of the SPA, which reduced the payments. Specifically, Plaintiffs allege that Defendant breached two marketing-related provisions of the SPA, breached its duty to use reasonable efforts to create Revenue, and failed to comply with the implied covenants of good faith and fair dealing.

Defendant asserts that both parties suffered from surprisingly lackluster profits, but contends that Defendant satisfied its obligations under the SPA. According to Defendant, Plaintiffs were aware of the risk of the parties' agreement but now seek to avoid a bargain with which they have become disenchanted.

## II.  **Findings of Fact**

It is undisputed that Revenue under the SPA is lower than the parties expected. Defendant's evidence reflects not only a decline in Revenue, but also "a sharp decline in retention of [E-V's existing] clients over time." (Tr. 506–12, 519; Defs.' Exs. ZZZ, AAAA.) The SPA lists 22 current clients of E-V as of the acquisition in September of 2003. (SPA at 39, Schedule 2.14(b).) In 2006, E-V earned Revenue from thirteen clients; the number of clients decreased to nine in 2007, four in 2008, and two in 2009.[1] (Defs.' Exs. ZZZ, AAAA.) Total Revenue attributable to E-V for 2006, 2007, and 2008 was $1,929,583, $639,852, and $401,030, respectively. Estimated Revenue in 2009, based on Revenue in the first half of the year, is $356,202. (Defs.' Exs. ZZZ, AAAA.)

At least one of E-V's existing clients, Max & Erma's, departed for reasons entirely unrelated to the acquisition. (Tr. 404–07.) Aside from Max & Erma's, the parties presented no evidence indicating why specific clients departed during the Revenue Period. Nonetheless, Plaintiffs point to several factors which, they contend, affected client retention and Revenue.

---

[1] No evidence was presented regarding client retention or Revenue earned in 2004 or 2005.

### *(i)      Inconsistent Retention of an E-V Marketing Resource*

The SPA required Defendant to "[r]etain an E-V marketing staff to be designated as the E-V Marketing Resource, reporting to [Defendant's] Executive Vice President, Marketing & Sales" during the three-year Revenue Period. (SPA at 39.) Ken Kish, an existing E-V employee at the time of the sale, was the first designated E-V Marketing Resource. (Tr. 157, 272, 275; Dewsnup Dep. 133–34.) He was terminated within two months of the sale because he was unproductive. (Tr. 306, 368.)

Following a gap of approximately four to five months during which there was no E-V Marketing Resource, Chuck Bates was hired to fill that position in April of 2004. (Tr. 275, 372, 385.) Bates was terminated in January of 2005.

Dewsnup, President of NABN, testified that he did not remember any E-V Marketing Resource other than Ken Kish and Chuck Bates. (Dewsnup Dep. 133–34.) When Baker, NABN's Chief Financial Officer, "expressed concern that we have this obligation to fulfill [under the SPA]," he was "told by [the] Buffalo [office]" that Kevin Dale, a Meritain sales associate out of Buffalo, would be the designated E-V Marketing Resource. (Tr. 274–75.) Dale was hired shortly after Bates was terminated. (Tr. 277.) Although Dale lived in Buffalo, he spent four or five days per week in Columbus, Dayton, or Toledo. While Meritain's management may have told Baker that Dale was the designated E-V Marketing Resource, no testimony was presented that Dale actually marketed E-V services. (Tr. 275–76.) Eggert testified that he was not aware of Dale's existence at any time during the Revenue Period. (Tr. 319.)

Baker testified that "Meritain killed off the E-V brand" in February of 2005.[2] (Tr. 284–85.) Thus, even if Dale retained the title of "E-V Marketing Resource" after February of 2005, he did not market the E-V brand after that time. (Tr. 317–18.) This is consistent with Baker's testimony that during the four to six month period that Baker was monitoring Dale's activity, Dale did not sign up a single new client attributable to E-V. (Tr. 275.)

The Court finds that, during the Revenue Period, Ken Kish was employed as the an E-V Marketing Resource for no more than two months, Chuck Bates was employed for ten months at most, and Kevin Dale marketed the E-V Brand for no more than one month, if at all. In sum, an E-V Marketing Resource was retained for no more than thirteen months out of the three-year Revenue Period, as required by the SPA.

### (ii) Inconsistent Introductions of Marketing Relationships

The SPA requires Defendant to "[i]ntroduce established marketing (i.e., broker/consultant) relationships in the Greater Columbus, Greater Toledo and other appropriate areas to the E-V Marketing personnel, as appropriate," during the three-year Revenue Period. (SPA at 39.) The evidence shows that Defendant made such introductions only during the employment of an E-V Marketing Resource.

Both Plaintiffs Eggert and Nickell testified that they were unaware of any introductions of established marketing relationships to E-V marketing personnel. (Tr. 122, 369.) Baker, on the other hand, testified that the introductions "were pretty consistent following the transition with Ken Kish and following Ken Kish with Chuck Bates and following Chuck Bates with Kevin Dale. But at some point in time after the sale of NABN to Meritain, I lost track of . . . that activity. It wasn't my direct responsibility anymore." (Tr. 272–73.) During that time, Baker

---

[2] Defendant apparently does not dispute that there was no E-V Marketing Resource after February of 2005. In its Proposed Findings of Fact, at paragraph 59, Defendant states that Ken Kish, Chuck Bates, and Kevin Dale were designated as E-V marketing resources who "remained through February, 2005."

testified that Cheryl Tidwell, NABN's Vice President of Marketing and Sales, provided Baker with status reports "indicat[ing] that [NABN was] making progress making those introductions." (Tr. 100, 272–74.)

While the parties have presented conflicting testimony regarding whether introductions occurred during the first half of the Revenue Period, the Court finds that Baker was in a better position to be aware of such introductions than were Eggert and Nickell. Specifically, following the acquisition by NABN, Eggert had no management authority, and his duties and responsibilities were limited to "help[ing] with marketing, to be available to provide advice and counsel when required[,] and to assist whenever [he] could with the [system] conversion." (Tr. 362; *see also* Joint Ex. J-5 (employment agreement).) While Nickell's responsibilities could have given him more involvement and knowledge following the acquisition, he spent much of that time in Florida caring for ill parents and resigned in May of 2004. (Tr. 97–99, 111–14, 315; Joint Ex. J-3.)

Having listened to the testimony and considered the apparent strengths and limitations of each witness's knowledge, the Court finds by the preponderance of the evidence that the required introductions occurred as long as Defendant retained an E-V Marketing Resource. As Eggert correctly pointed out at trial, however, "[f]or much of the revenue period, there were no E-V marketing personnel to which [Defendant] could even introduce people." (Tr. 370.) Indeed, for the period following Defendant's retention of an E-V Marketing Resource, the only evidence regarding introductions is Eggert's testimony that there were none. The Court therefore finds that introductions were not made during gaps in retention of an E-V Marketing Resource—times at which E-V had no marketing staff to receive an introduction.

### (iii) *Staff Reductions*

E-V employed roughly 65 people in 2003. (Tr. 85.) Between September of 2003 and June of 2004, Defendant implemented two rounds of layoffs, terminating approximately 40 of those employees. (Tr. 115–17.) Plaintiffs suggest that these staff reductions adversely affected client service and client retention. In contrast, the testimony of E-V's customer service manager, Stephanie Turney, suggests that the layoffs may not have significantly affected client retention.[3]

Prior to 2003, Stephanie Turney provided service directly to clients and supervised other account managers. (Tr. 469.) In 2003, prior to the acquisition, she more actively managed the client base due to some staff attrition. (Tr. 470.) At that time, she and only one staff member were responsible for all E-V clients. (471.) It is not clear whether the *pre-acquisition staff attrition* impacted E-V's levels of client service and satisfaction—and therefore client retention.

Turney testified that her position, responsibilities, and staff did not change following the sale of E-V to NABN. (Tr. 476.) Although there was a decrease in staff in the Columbus and Cleveland offices, after Meritain acquired NABN, Turney saw no change in the way Meritain conducted business with relation to her supported customers. (Tr. 480.) She conceded that, after NABN acquired E-V, she felt "at the time" that (a) "E-V's maintaining a presence in central Ohio was important to the clients [she] dealt with" and (b) "maintaining the complement of employees that E-V had in Columbus was important to those clients." (Tr. 484.) This testimony, however, does not establish that a reduced staff affected client retention. The Court finds insufficient evidence from which to conclude that staff reductions caused a loss of clients or revenue.

---

[3] Turney continued to manage customer service for Defendant until she resigned in April of 2005; she resigned in order to decrease her work-related travel. After working for another company for several months, she returned to Defendant in December of 2005. (Tr. 482.)

### (iv)    *Problematic System Conversion*

Shortly after acquiring E-V, NABN converted E-V's clients to NABN's software program, called "LuminX." (Tr. 38–39.) LuminX had certain advantages over E-V's existing software, particularly relating to compliance with the then-new Health Insurance Portability and Accountable Act ("HIPAA"). (Tr. 128, 344.) The technological conversion did not go well, however, causing client dissatisfaction. (Tr. 39.)

Nickell, who had been responsible for E-V's information technology prior to the acquisition, testified that he raised concerns regarding the conversion with Dewsnup and Jim Pashock, NABN's employee who implemented the conversion. (Tr. 107–11.) Nickell warned Dewsnup and Pashock that LuminX was not able to duplicate certain functions that were utilized in E-V's existing software and that these discrepancies "could hinder the ongoing relationship we have both with our employer groups and the provider network in terms of payment of those claims to the providers." (Tr. 107–11.)

Nickell testified that he did not know whether all of his concerns were addressed before the conversion because, as he testified, he "was not directly participating" in the process. (Tr. 111.) From late October of 2003 to February of 2004, Nickell spent most of his time in Florida, caring for ill parents and working via email and phone. (Tr. 113–14.) He tendered his resignation in October of 2003, effective May 31, 2004. (Tr. 156.) Nickell testified that he "recognized this was a critical time because of all of the conversion activity," but he "really needed to be there for [his family]" and "really didn't know what [his] future was going to be." (Tr. 112.) Baker testified that, while he was "very empathetic about [Mr. Nickell's] situation" and did not criticize Nickell for his availability, NABN "lost Greg Nickell for all intents and purposes." (Tr. 311, 315.) Baker further testified that "Greg was a real detail guy that we felt

was a key to the ongoing success of that business and to the success of the conversion. . . . [H]e helped us out quite a bit part-time, but in my experience, part-time commitments aren't as good as full-time commitments." (Tr. 311, 315.)

Consistent with Nickell's warnings, Dewsnup testified that "[t]here was a significant period of time where we found out that the same terms used in both companies didn't necessarily have the same definitions, and that caused some adjudication issues for several weeks . . . as those were found and then corrected." (Dewsnup Dep. 141.) He added that these issues "created problems with *every* account." (*Id.* (emphasis added).)

While Defendant internally encountered problems with every account, Turney and Baker testified that only some clients were adversely affected by the conversion. Turney testified that while "[m]ost of the [clients] converted well," there were "a few [clients] that had programming problems." (Tr. 477.) Baker testified that "[i]n some cases" the conversion was a "*traumatizing event for the clients*." (Tr. 278 (emphasis added).)

Plaintiffs do not criticize the decision to make the conversion, which was contemplated by the parties prior to the acquisition. Rather, Plaintiffs contend that the conversion was implemented too quickly. While successful conversions are possible, the evidence reflects that conversions are "very difficult" and "[a]bsolutely" can be problematic for TPAs and can cause loss of clients. (Tr. 150, 162.) Plaintiff's expert, Glenn McLellan, agreed that he would "describe the combination of a [TPA acquisition] and a system conversion as a recipe for disaster," resulting in "a likely chance of losing customers."[4] (Tr. 219.) According to McLellan, most TPA sellers now insist on a 12-24 month moratorium on conversions following a sale. He

---

[4] On the other hand, McLellan opined that, "like any well-managed project, a system conversion can be effective and can be done without . . . significant disruption of a business." (Tr. 239–40.) Having taken part in a couple of essentially seamless conversions, McLellan testified that "[s]ystem conversions are like any project. If you don't plan them out, if you don't communicate to all the parties involved, if you don't take the time, if you don't do quality assurance, then you open yourself up to issues." (Tr. 239.)

also testified, however, that such practice is much more prevalent today than in 2003. (Tr. 217–18, 241.) E-V did not insist on a moratorium on the conversion. (Tr. 152.) Nickell testified, however, that the parties had discussed a process and established timelines for the conversion:

> [T]here was an order of approach. So, we would start with client A and do that conversion and then move to client B. So, we had a specific order set. There were timelines established. There was . . . training that took place on both staffs so that . . . you could determine whether [the systems were] truly going to process the same way. And there was a process of determining whether [LuminX was replicating E-V's services]. And through that process . . . there were points when I was getting reports back from the staff that . . . [LuminX was not replicating E-V's services]. And so, again, I would engage in discussions with Jim Pashock and Ron Dewsnup about those issues.

(Tr. 163; see Tr. 107.) Throughout the conversion process, Nickell was advising NABN to slow down the process in order to "clean up" what was already done and to ensure that the remaining conversions went more smoothly. (Tr. 150.) Todd Squilanti, Senior Vice President of Corporate Development for Prodigy Health, which owns and operates Defendant Meritain, testified, "I can say that a poor job was done in conversion. No question. I can't say as to whether it was NABN's fault or the seller's fault or anybody else's fault. It is unclear why the system conversion went poorly." (Tr. 27, 39.)

The record does not indicate why the conversion went as quickly as it did, or whether it would have been wise to slow the process. As mentioned above, one of the benefits of LuminX was compliance with HIPAA. Defendant suggests that a looming compliance deadline motivated the speed of the conversion. (Tr. 20.) Even assuming that the parties could have requested an extension, as Nickell opined was possible (Tr. 164), it is unclear from the record whether an extension would have been available.

From the evidence presented, the Court cannot find that the conversion occurred in violation of the SPA. Plaintiffs do not contend that the conversion was unnecessary. Problems

10

in implementation were aggravated by the absence of Nickell. Further, no evidence was presented indicated that any clients were lost due solely to the conversion.

### *(v)    Closing the Columbus Office*

Defendant closed E-V's Columbus office in February of 2005, less than half-way through the Revenue Period.[5] (Tr. 287.) NABN's top management, Baker and Dewsnup, testified that this move hurt E-V's ability to satisfy its current clients and attract new ones. (Tr. 285; Dewsnup Dep. 136, 137.) According to Baker, "a presence in central Ohio was essential for the development of further business in central Ohio and for preserving the account base in central Ohio." (Tr. 281.) In fact, prior to acquiring E-V, NABN actually had lost business in central Ohio because it did not have a local presence. (Tr. 256.) Dewsnup agreed that E-V would be better suited to satisfying its existing clients and attracting future clients in central Ohio if it had a physical presence there, and conceded that Defendant never made a determination that E-V's service could improve in central Ohio without such a physical presence. (Dewsnup Dep. 136, 137.)

The Court credits Baker's testimony that the office closure directly impacted revenue retention for the E-V book of business. (Tr. 285.) Although the evidence shows that NABN experienced financial difficulty, Defendant presented no evidence indicating Meritain's reasons for closing the Columbus office.

### *(vi)    The Summit County Opportunity*

Eggert was a "lifelong friend" of Don Plusquellic, the mayor of Akron, Ohio. (Tr. 387.) Eggert and his wife made a personal trip to Boston to support Mayor Plusquellic when he was installed as the president of the National Conference of Mayors in 2004. (Tr. 387–88.) In

---

[5] Baker testified that in February of 2005, the Columbus office "was shut down for calls and claim activity," and the E-V brand had been "killed off . . . at that point." (Tr. 284–85.) However, three to four employees remained at the Columbus office at that time. (Tr. 284–85.)

Boston, Mayor Plusquellic introduced Eggert to the Executive Director of Summit County, Ohio. (Tr. 388.) Eggert testified that he "spent time on a couple of occasions during the conference speaking with the Executive Director," who gave Eggert his business card and requested that Eggert call him. (Tr. 388.)

When Eggert returned to Ohio, he contacted Ken Jones in Summit County's Risk Management Department, which handled the county's employee benefit plan. (Tr. 389.) They set up a meeting in August of 2004, attended by Eggert, Chuck Bates, Jones, and Mayor Plusquellic. (Tr. 390, 391.) Eggert testified that he found the meeting to be "[v]ery favorable," and a follow-up meeting was arranged between Eggert, Bates, and Jones to further discuss the program. (Tr. 390.)

Eggert "immediately reported to Ron Dewsnup and Cheryl Tidwell the details of the meeting," telling them that "it was a great opportunity," that Mayor Plusquellic "attended and gave a strong reference to us and participated in the meeting and discussions about the program," and that a follow-up meeting had been arranged. (Tr. 390–91.) At Dewsnup's request, Eggert arranged for Tidwell to attend the follow-up meeting along with Eggert and Bates. (Tr. 391.) Just prior to that follow-up meeting, Tidwell, who was arriving from a different direction, met Eggert and Bates at a restaurant and advised them that Eggert and Bates "were to stay out of Summit County." (Tr. 391–92.) She further advised them that Sandy Hahn, a sales representative of NABN, would be pursuing the Summit County opportunity. (Tr. 393.) If Hahn had secured the account, the revenue would not have been attributable to E-V. (Tr. 394.)

Following the meeting at the restaurant, Eggert, Bates, and Tidwell met briefly with Jones. Eggert testified that "[t]here was a little confusion on Mr. Jones' part, he didn't

understand what we were doing, and I indicated that we were introducing Mrs. Tidwell and that she would be coordinating the effort to quote on the business." (Tr. 393.)

Eggert testified that Summit County was seeking a benefits program covering approximately 3,525 employees, commencing in January of 2005, and potentially involving the payment of medical claims, utilization review, and the medical management part of case management. (Tr. 391, 393, 394.)

At trial, Plaintiffs' counsel asked Baker whether he denied directing Tidwell to instruct Eggert and Bates to keep out of Summit County. Baker did not specifically deny it, but testified that he could not "recall ever saying that to Cheryl Tidwell." (Tr. 281.) Defendant presented no other evidence regarding the Summit County opportunity, and no witness contradicted Eggert's testimony that Tidwell told him to stay out of Summit County. The Court finds that Defendant prevented Plaintiffs from taking advantage of the Summit County opportunity, which could have increased Revenue, thereby increasing the amount of monies owed Plaintiffs under the SPA.

## III.  **Analysis of Plaintiffs' Contract Claim**

"Under Ohio law, the elements of a common law breach of contract are (1) that a contract existed, (2) that the plaintiff fulfilled his obligations, (3) that the defendant unlawfully failed to fulfill his obligations, and (4) that damages resulted from this failure." *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 563 (6th Cir. 2007) (citing *Lawrence v. Lorain County Cmty. Coll.*, 127 Ohio App. 3d 546 (Ohio Ct. App. 1998)).

The parties do not dispute the first two elements. The parties entered into a binding contract, and Defendant does not contest that Plaintiffs fulfilled their obligations. Defendant disputes the third and fourth elements, however, asserting that it fulfilled its obligations under the

13

SPA and contending that Plaintiffs have not presented sufficient evidence upon which an award of damages may be made.

### A. **Defendant's Alleged Failure to Fulfill Its Obligations**

Plaintiffs seek to prove that Defendant breached the SPA by showing that Defendant (1) failed to comply with the express provisions of the contract, (2) breached its duty to expend reasonable efforts to create Revenue, and (3) failed to comply with the implied covenants of good faith and fair dealing.

### 1. **Express Provisions of the Contract**

Plaintiffs allege that Defendant breached two requirements set forth in the SPA's definition of "Revenue." That section of the SPA mandates "*material compliance*" with, inter alia, the following requirements: (a) Defendant must "[r]etain an E-V marketing staff to be designated as the E-V Marketing Resource, reporting to [Defendant's] Executive Vice President, Marketing & Sales"; and (b) Defendant must "[i]ntroduce established marketing (i.e., broker/consultant) relationships in the Greater Columbus, Greater Toledo and other appropriate areas to the E-V Marketing personnel, as appropriate." (SPA at 39.) Baker testified that he understood that these obligations were in effect throughout the entire three-year Revenue Period. (Tr. 271, 274.)

As discussed above, the evidence shows that Defendant retained an E-V Marketing Resource for no more than thirteen months during this period. The Court therefore finds that Defendant did not materially comply with the requirement that it retain an E-V Marketing Resource.

Plaintiff also asserts that Defendant did not materially comply with its obligation to introduce established marketing relationships to E-V marketing personnel, as appropriate, during

14

the three-year Revenue Period. As discussed above, the Court finds that Defendant made such introductions only during the employment of an E-V Marketing Resource, a position that was filled for no more than thirteen months.

The SPA requires that such introductions must be made "as appropriate." One reading of this provision could lead to the conclusion that all appropriate introductions had been made prior to February of 2005, when "Meritain killed off the E-V brand" and after which no E-V Marketing Resource was retained. (Tr. 284–85.) The Court finds, however, that the clear language and expressed intent of the parties was that introductions would be made during the first few months following the acquisition, including the four to five month gap early in the Revenue Period, following Ken Kish's termination and preceding Chuck Bates' hire. Because no introductions could have been made during this time, or any other time when no E-V marketing staff was employed, the Court finds that Defendant failed to materially comply with the requirement that it introduce established marketing relationships to E-V marketing personnel.

## 2.    Duty to Expend Reasonable Efforts

This Court has already concluded that "Defendant's promise to pay revenue during the [Revenue Period] included a promise to use reasonable, or best efforts to bring profits and revenues into existence." (2008 Opinion at 9–10, 2008 U.S. Dist. Lexis 90830 at *16.) Under Ohio law, "a contractual provision which gives a party the exclusive right to market a product on behalf of another imposes upon that party a duty to employ reasonable efforts to generate sales of the product." *Ill. Controls v. Langham*, 70 Ohio St. 3d 512, 520 (Oh. 1994); *see also Source Assocs. v. Valero Energy Corp.*, 273 Fed. Appx. 425, 429 (6th Cir. 2008) (citing *Ill. Controls*, 70 Ohio St. 3d 512). Here, payouts to Plaintiffs were largely contingent on Defendant's generation of revenue from operating E-V's business during the Revenue Period, obligating Defendant to

15

use reasonable efforts to generate revenue attributable to E-V.[6] The evidence shows that Defendant did not employ reasonable efforts to generate revenue from E-V's clients.

The testimony reflects that, aside from client service, at least three factors were particularly important to E-V's success: (1) a robust marketing and sales function, (2) a local presence, and (3) E-V's brand. Baker testified that a robust marketing and sales function is "absolutely" essential to the growth and success of any TPA. (Tr. 259.) E-V's brand and local presence were also essential: Dewsnup testified that NABN "wanted to retain the E-V brand along with NABN because it was important in the clients' minds." (Dewsnup Dep. 71.) "[C]oncerning the importance of local representation and continuity of service for a TPA, especially in Ohio," McLellan testified that "[i]t is absolutely essential that the TPA maintain a local presence, that they provide very hands-on service, that they understand the market that they are working in and that they are close to their clients." (Tr. 181.) This is particularly important in Ohio's local TPA market because that market is considered to be "provincial," meaning that local companies prefer to have benefits delivered by local TPAs. (Tr. 255–56.)

As discussed above, Defendant retained an E-V marketing staff of only one person—the E-V Marketing Resource—for no more than thirteen months. Halfway through the Revenue Period, Defendant eliminated E-V's brand name and closed its local office, "hurt[ing] [E-V's] ability to service clients in that market." (Tr. 285.) Even Baker conceded that "NABN's marketing efforts prior to its acquisition by Meritain in the central Ohio area had not been particularly good." (Tr. 276.) The Court agrees.

Plaintiffs also point to Defendant's severe staff reductions, suggesting that the layoffs affected client service. While layoffs undoubtedly have the potential to affect client service and

---

[6] While parties may contractually modify or eliminate the implied duty to use reasonable efforts, the Court has already found that the parties did not do so here. (Aug. 4, 2009 Opinion at 8, 2009 U.S. Dist. Lexis 68431 at *12.)

16

retention, the evidence does not demonstrate that it happened here. Plaintiffs bear the burden of proof in demonstrating a breach of contract. They have not met the burden on this issue.

Finally, Plaintiffs blame much on the system conversion. The Court accepts Baker's testimony that the conversion was "a traumatizing event" for some clients and finds that the conversion, along with other factors, caused client attrition and loss of Revenue. As discussed above, however, it is unclear what caused the problems in the conversion, and the Court is not able to find by the preponderance of the evidence that Defendant's handling of the conversion was inconsistent with its obligation to use reasonable efforts.

While Defendant is not responsible for all of the factors that apparently caused client attrition, the Court finds that it did breach its obligation to exercise reasonable efforts to generate Revenue by failing to employ a sufficient marketing staff, closing the Columbus office, and eliminating E-V's brand name.

### 3. Implied Covenants of Good Faith and Fair Dealing

If a contract is "silent, as opposed to ambiguous, with respect to a particular matter," then the parties "are required to use good faith to fill the gap." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 764 (6th Cir. 2008) (applying Ohio law) (citing *Burlington Res. Oil & Gas Co. v. Cox*, 133 Ohio App. 3d 543 (Oh. Ct. App. 1999); *Myers v. Evergreen Land Dev. Ltd.*, case 07-MA-123, 2008 Ohio 1062, ¶ 28 (Oh. Ct. App. March 6, 2008)). The good faith requirement is "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Savedoff*, 524 F.3d at 764 (citing *Ed Schory & Sons v. Francis*, 75 Ohio St. 3d 433 (Oh. 1996)). The duty of good faith depends upon the contract language, "which leads to an evaluation of reasonable expectations of the parties." *Savedoff*, 524 F.3d at 764 (emphasis

added) (citing *Fultz & Thatcher v. Burrows Group Corp.*, case CA2005-11-126, 2006 Ohio 7041, ¶ 34 (Oh. Ct. App. Dec. 28, 2006)).

A covenant of good faith and fair dealing will not be implied to override express contractual terms, *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003), but the Court has already found that such an implied covenant of good faith and fair dealing applies to several issues on which the SPA is silent. These issues include treatment and retention of E-V staff, together with maintenance of E-V's brand and local presence. (Aug. 4, 2009 Opinion at 5–6, 2009 U.S. Dist. Lexis 68431 at *8–9.)

Plaintiffs allege that Defendant breached the implied covenants of good faith and fair dealing when it "dismantled E-V's staff and business, thereby depressing actual revenue from that business and curtailing 'Revenue' as defined in the [SPA]." (Compl. ¶ 28.) To the extent that the Court has determined that Defendant's actions violated Defendant's duty to expend reasonable efforts, the Court also finds that such actions violate Defendant's covenant of good faith and fair dealing. By failing to exercise reasonable efforts, Defendant breached the implied covenants of good faith and fair dealing. *Savedoff*, 524 F.3d at 764.

As discussed above, the Court also found that Defendant prevented Plaintiffs from taking advantage of a promising opportunity in Summit County. Because Defendant took opportunistic advantage in a way that could not have been contemplated at the time of drafting, this action also violates Defendant's duty of good faith and fair dealing.

## B.   **Damages**

Under Ohio law, lost profits generally may be recovered in a breach of contract action if (1) the profits were within the parties' contemplation when the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and

18

speculative and may be shown with reasonable certainty. *Thomasville Furniture Indus., Inc. v. Elder-Beerman Stores, Corp.*, 250 B.R. 609, 620 (S.D. Oh. 1998) (citing *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 466 N.E.2d 883, 887 (Ohio 1984)).

It is undisputed that profits were within the parties' contemplation when they entered into the SPA, thereby satisfying the first condition. As for the second and third requirements, the Court finds that Defendant's breach of its obligations under the SPA resulted in the loss of profits and that the amount lost is not remote and speculative, and may be shown with reasonable certainty. Although the third prong presents the greatest challenge, the second and third requirements are discussed together.

The reasonable certainty requirement dictates that a plaintiff must prove both the existence *and* the amount of damages to a reasonable certainty. *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St. 3d 177, 183 (Ohio 1990); *Thomasville*, 250 B.R. at 628 (citing *Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St. 3d 65, 68 (Ohio 1988) (noting that "the third prong is but a single hurdle" and that "the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty")).

While evidence of lost profits must be reasonable, it need not be specific. *Thomasville*, 250 B.R. at 620 (citing *Combs*, 466 N.E.2d at 887). A claim for lost profits is "legally sufficient" if the evidence provides "an adequate factual basis upon which to calculate . . . the amount of lost profits claimed." *Thomasville*, 250 B.R. at 629 (citations omitted). A plaintiff "may establish lost profits with reasonable certainty through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts." *AGF*, 51 Ohio St. 3d at 183–84. A plaintiff must offer more than an expert's mere assertion that the plaintiff would have made a particular amount of

profits; the figure must be "substantiated by calculations based on facts available or in evidence." *Thomasville*, 250 B.R. at 629 (citing *Endersby v. Schneppe*, 596 N.E.2d 1081, 1084 (Oh. Ct. App. 1991)).

The Court is "mindful of the fact that proof of damages of lost profits often requires some conjecture." *Id.*, 250 B.R. at 630 (citing *Miami Packaging, Inc. v. Processing Sys., Inc.*, 792 F. Supp. 560, 566 (S.D. Oh. 1991); *Jaynes v. Vetel*, 80 N.E.2d 621, 624 (Oh. Ct. App. 1948) ("Although no recovery can be had for profits which are uncertain, contingent, conjectural, or speculative, it must be borne in mind that profits must in their very nature be to some extent uncertain and conjectural, so that one cannot on that account, or account of difficulties in the way of proof, be deprived of all remedy.")).

To determine Plaintiffs' damages, the Court must calculate the difference between what Defendant has actually paid Plaintiffs and the amount that Plaintiffs would have been entitled to receive in the absence of a breach of the contract. *See Allen, Heaton & McDonald v. Castle Farm Amusement Co.*, 151 Ohio St. 522, 526 (Ohio 1949).

### 1. Revenue in the Absence of a Breach

To determine the amount that Plaintiffs would have been entitled to receive in the absence of a breach of the contract, the Court must determine if damages have been established, and, if so, the amount of Revenue that E-V would have enjoyed in the absence of a breach, considering all other facts and circumstances that may have caused lost profits. *See Thomasville*, 250 B.R. at 620–21. The Court considers the parties' expected baseline revenue, the market opportunities available to E-V during the Revenue Period, potential causes of client attrition unrelated to Defendant's breach, and the effect of Defendant's actions specifically relating to the Summit County opportunity.

20

#### *(i)*     *Base Revenue Amount*

The parties agreed in the SPA that if E-V neither gained nor lost clients, its baseline annual revenue ("Base Revenue Amount") during the Revenue Period would be $4,298,000. (SPA at 36.) Eggert testified that the Base Revenue Amount is the revenue that "the purchasers . . . would have expected on an annual basis from the existing business, E-V Benefits going on as a going concern, with no new business, [and] no loss of clients." (Tr. 409.)

#### *(ii)*     *Market Opportunities*

McLellan testified that E-V's local TPA market during the Revenue Period was "absolutely[] exploding with opportunities." (Tr. 199.) First, a scandal broke in January of 2005 involving kickbacks paid to brokers working for Columbus Public Schools, with the result that many brokers stepped up their efforts to search for better healthcare plan alternatives, including TPAs. (Tr. 199–200.) At the same time, Medical Mutual, "one of [Ohio's] preeminent carriers," began to lease its preferred provider network to TPAs, "open[ing] up a huge opportunity." (Tr. 200.) In Toledo, where E-V did a substantial amount of business, a new independent network also became available to TPAs; it was the only network that included the two major hospital chains in the area. (Tr. 89, 200.)

Finally, numerous large companies in the Columbus market presented bidding opportunities during the Revenue Period. (Tr. 200–01.) McLellan recalled that CenBen, the local TPA with which he was involved during the Revenue Period, saw an average of 70-75 opportunities per year in Columbus; the average opportunity included 375 covered employees. (Tr. 201, 223.) According to McLellan, the average TPA can close between six and eleven or twelve percent of the opportunities presented; CenBen averaged over sixteen percent. (Tr. 201– 02.) McLellan opined that if a TPA were to close between six and ten percent of such

opportunities, it would obtain between $400,000 and $500,000 of additional revenue per year. (Tr. 209–10.)

The Court finds that E-V faced a promising market during the Revenue Period, and that in the absence of any negative facts or circumstances facing E-V specifically, it would have been able to take advantage of this market. Based on evidence that the average TPA can close 6-12% percent of 70-75 opportunities presented each year, the Court finds that E-V, as a TPA with an excellent reputation, would have been *reasonably certain* to close 6% of 70 opportunities per year during the Revenue Period, or four opportunities per year. Multiplying four opportunities per year by 375 covered employees per opportunity yields 1,500 employees. TPA revenue is measured per employee per month, or "PEPM"; PEPM generally ranges from $15 to $27 and averages at approximately $20. (Tr. 28, 202, 333–34.) Multiplying 1,500 employees by $20 PEPM yields $30,000 of revenue per month. At that rate, the Court finds to a reasonable certainty that E-V would have added $360,000 to its revenue each year. Because each year's addition would carry into the following years, the added revenue would total $360,000 in the first year, $720,000 in the second year, and $1,080,000 in the third year, for a total of $2,160,000 for all three years and an annual average increase in revenue of $720,000.

### *(iii)    Potential Causes of Client Attrition Unrelated to Breach*

The Court must consider facts and circumstances, unrelated to Defendant's breach, which may have caused client attrition or loss of opportunities. *See Thomasville*, 250 B.R. at 620–21.

The fact that E-V was acquired is by itself consistent with an expectation of client attrition. Squilanti testified that "every acquisition projection that we put together includes a significant expectation of client attrition. And so as a baseline, you forecast a minimum of 15 percent attrition and maybe more depending on what other underlying risk factors you discover

when you are analyzing the business." (Tr. 32.) The fact of the acquisition alone is not likely to cause attrition; rather, an acquisition is likely to cause "bumps in the road" for clients as the newly merged company undergoes changes. The Court finds that this is consistent with the evidence of a rocky system conversion, and finds by the preponderance of the evidence, based upon the unrefuted testimony of Todd Squilanti, that the acquisition and associated system conversion caused approximately 15% client attrition. Fifteen percent of the $4,298,000 Base Revenue Amount equals a loss of $644,700 in annual revenue.

The loss of Max & Erma's as a client, for reasons wholly independent of the matters in this case, also caused a decrease in Revenue. The evidence shows that the total Revenue lost from that client account amounted to $705,600; if this total is divided by three years, it amounts to an average annual loss during the Revenue Period of $235,200. (Tr. 417.)

Another factor independently driving client attrition or the loss of opportunities was E-V's loss of its principal sales person within one year of the acquisition. Gary Van Arsdale was E-V's President and Chief Operating Officer, as well as the company's principal sales person, until he left at the end of 2002. (Tr. 76, 83, 126.) Nickell testified that E-V was still "looking at reestablishing [its] sales and marketing program" in 2003. (Tr. 90.) The Court finds by a preponderance of the evidence that Van Arsdale was a significant factor in what appears to have been E-V's exceptional growth prior to the acquisition. Van Arsdale's departure most likely slowed this growth; however, the testimony presented did not demonstrate that his departure otherwise affected existing clients. The Court finds, therefore, that the loss of Van Arsdale does not affect the calculations.

Finally, as discussed above, the Court has found that some staff attrition occurred prior to the acquisition, with the result that the remaining staff members were responsible for providing

service to a greater number of clients. Although this could have affected client service, there is no evidence that the staff attrition caused client attrition.

### *(iv)* *The Summit County Opportunity*

As discussed above, the Court has found that Defendant prevented E-V from obtaining business in Summit County. Eggert testified that the PEPM revenue for the Summit County opportunity would have been approximately $16 due to the size of the group. (Tr. 397.) Multiplying $16 by the 3,525 employees to have been covered in Summit County, it appears that the Summit County opportunity was worth $56,400 per month in revenue. Because the opportunity was to have started in January of 2005 and the Revenue Period ends in September of 2006, the Court finds that it most likely would have covered 20 months in the Revenue Period. Multiplying 20 months by approximately $56,400 per month in revenue yields an approximate total of $1,128,000 in revenue. Dividing that total by three yields the average annual increase during the Revenue Period from this opportunity, equal to $376,000.

Having considered the parties' agreed expectations regarding baseline revenue, the market opportunities described at trial, and the various challenges faced by E-V, the Court finds that, in the absence of a breach, E-V would have enjoyed an average annual Revenue of $4,514,100 during the Revenue Period. This amount is the sum of the Base Revenue Amount ($4,298,000) and the average annual increase E-V should have enjoyed from existing market opportunities in Columbus ($720,000) and the Summit County opportunity ($376,000), less the annual amounts lost due to factors unrelated to Defendant's breach: the amount lost due to the acquisition and associated rocky system conversion process ($644,700) and the decrease in revenue from the loss of Max & Erma's ($235,200) (Tr. 417).

The Court finds that Defendant's breach caused client attrition and prevented E-V from earning new clients during the Revenue Period, both such circumstances detracting from the generation of revenue that, if realized, would have increased payments due to Plaintiffs.

### 2.   **Calculation of Damages**

#### *(i)   Payments to Eggert Agency and Mount Carmel*

The SPA provides that 80% of the purchase price for NABN's acquisition of E-V would be paid in the form of two seven-year subordinated term notes (the "Notes") in the total original principal amount of $908,000, with $676,872.72 to be paid to Eggert Agency and $231,127.28 to be paid to Mount Carmel. (SPA at 1; SPA Exs. A-1, A-2.) The SPA provides that at the end of the Revenue Period, the Notes shall be adjusted by an amount calculated as the multiple of (a) the difference between (i) the actual average annual Revenue during the Revenue Period and (ii) the Base Revenue Amount of $4,298,000; (b) a Revenue Multiple of 0.48; and (c) a Stock Factor of 0.55. (SPA at 1, 36, 41.) Depending on whether the actual average annual Revenue is greater or less than the Base Revenue Amount, the resulting multiple is then added to or deducted from the outstanding principal amount under the Notes and reamortized at the same interest rate over the remaining four years. (SPA at 1.)

Because the Court has determined that the average annual Revenue in the absence of a breach would be $4,514,100, the Notes should be adjusted as follows. The difference between the Base Revenue Amount ($4,298,000) and what should have been the actual average annual Revenue during the Revenue Period ($4,514,100) equals $216,100. Multiplying that amount by the Revenue Multiple (0.48) and the Stock Factor (0.55) yields $57,050.40.

Because the Court has determined that the actual average annual Revenue in the absence of a breach would have been greater than the Base Revenue Amount, the resulting multiple

25

($57,050.40) must be added to the outstanding principal amount under the Notes. As of the end

of the Revenue Period, September 9, 2006 (*see* SPA at 2), the outstanding principal amount of

the Note in favor of Eggert Agency was $415,304.54, and the outstanding principal amount of

the Note in favor of Mount Carmel was $141,811.31. (SPA Exs. A-1 at 48, A-2 at 53

(Amortization Schedules).) Thus, the aggregate outstanding principal amount under the Notes

was $557,115.85. Adding that amount ($557,115.85) and the multiple under the SPA

($57,050.40) yields an adjusted aggregate principal of Notes as of September 9, 2006 of

$614,166.25.

Because Eggert Agency owned 74.5455% of E-V, Eggert Agency's adjusted principal

amount (as of September 9, 2006) is 74.5455% of the adjusted aggregate principal: $457,832.69;

Mount Carmel, which owned 25.4545% of E-V, has an adjusted principal amount of

$156,333.56. (*See* Tr. 424–25; SPA at 1.)

The parties' dispute relates to the payments due under the SPA following the September

2006 adjustments described above.[7] As of September of 2006, sixteen payments remained to be

made under the Notes. Dividing each Note holder's adjusted principal amount as of September

of 2006 by sixteen payments yields an adjusted payment amount of $28,614.54 for Eggert

Agency and $9,770.85 for Mount Carmel.[8]

Of the sixteen payments remaining as of September of 2006, thirteen payments have

become due as of the date of this opinion; the last three payments will become due on March 9,

---

[7] The parties agree that Eggert Agency and Mount Carmel have received all payments due under the Notes through
September of 2006. (Joint Ex. 8 (stipulating that Eggert Agency had received twelve payments of $28,800.01 and
Mount Carmel had received twelve payments of $9,834.15); SPA Exs. A-1 at 48, A-2 at 53 (Amortization
Schedules).)

[8] The Notes provide for an annual interest rate of 5%; however, Plaintiffs have not presented any evidence of the
effect of such interest on the adjusted amortization schedules. Moreover, Plaintiffs acknowledge that their
demonstrative damages calculations, which were adopted in Plaintiffs' proposed findings of fact and conclusions of
law, disregard interest. (*See* Pl.'s Ex. 51 at 4; Tr. 427–28.) In this Opinion and Order, the Court does not therefore
award interest under the Notes.

26

June 9, and September 9 of 2010. To calculate the payments already due to Eggert Agency, the Court multiplies thirteen payments by the adjusted payment amount of $28,614.54, for a total amount due of $371,989.06. The parties stipulate that between September of 2006 and the time of trial, Eggert Agency received twelve payments of $15,356.88, for a total of $184,282.56. (Joint Ex. 8.) Subtracting the $184,282.56 already paid from the $371,989.06 due to Eggert Agency yields an outstanding total of $187,706.50. Three more payments of $28,614.54 each will become due on March 9, June 9, and September 9 of 2010.

Following the same methodology, multiplying thirteen payments by the adjusted payment amount of $9,770.85, the Court finds that a total of $127,021.02 is already due to Mount Carmel. The parties stipulate that between September of 2006 and the time of trial, Mount Carmel received twelve payments of $5,243.82, for a total of $62,925.84. (Joint Ex. 8.) Subtracting the $62,925.84 already paid from the $127,021.02 due to Mount Carmel yields an outstanding total of $64,095.18. Three more payments of $9,770.85 each will become due on March 9, June 9, and September 9 of 2010.

### (ii)    *Payments to Eggert and Nickell*

Defendant is also obligated to make certain payments ("Stipulated Payment Amounts") to Eggert and Nickell in connection with the E-V Benefits Management Inc. Incentive Growth Plan, dated May 29, 2003 and amended on August 31, 2003 (the "Growth Plan"). Defendant's obligations under the Growth Plan are tied to its payment obligations under the SPA; specifically, the Growth Plan payments due after September of 2006 are adjusted proportionally to the payment adjustments under the SPA. NABN recognized the important role of Eggert and Nickell in the acquisition of E-V and intended that they should benefit from the SPA via the adjustment mechanism. Eggert and Nickell are therefore intended beneficiaries of the SPA and

27

have enforceable rights under that contract and the Growth Plan. *Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St. 3d 36, 40 (Ohio 1988) (quoting *Norfolk & Western Co. v. United States*, 641 F.2d 1201, 1208 (6th Cir. 1980)).

The Stipulated Payment Amounts under the Growth Plan were as follows. Eggert was to receive $138,000 on the date of the First Amendment as well as 28 additional payments of $23,500 each, commencing on December 9, 2003, and payable on each March 9, June 9, September 9, and December 9 thereafter and ending with the payment to be made on September 9, 2010. (SPA Ex. C at 60.) Nickell was to receive $47,500 on the date of the First Amendment as well as 28 additional payments of $8,062.50 each, commencing on December 9, 2003, and payable on each March 9, June 9, September 9, and December 9 thereafter and ending with the payment to be made on September 9, 2010. (*Id.*) However, if the payments under the Notes would be adjusted, the payments to both Eggert and Nickell would be adjusted proportionally. (*Id.*) Because the Court has determined that the aggregate principal of the Notes, $557,116, must be adjusted as of September 9, 2006 to $614,166.25, an increase of 10.2403%, the amounts due under the Growth Plan must also be increased as of September 9, 2006 by 10.2403%.

It is undisputed Eggert and Nickell received the payments due to them through September of 2006. (Joint Ex. 8 (stipulating that, as of September of 2006, Eggert had received twelve payments of $23,500, for a total of $282,000; and Nickell had received twelve payments of $8,062.50, for a total of $96,750).) As is the case with Defendant's payments under the Notes, the parties' dispute relates to payments following the adjustment in September of 2006. To determine the adjusted payments due, the Court adds 10.2403% to Eggert's original payment amount of $23,500, for an adjusted payment amount of $25,906.47; and adds the same

percentage to Nickell's original payment amount of $8,062.50, for an adjusted payment amount of $8,888.12.

As of September of 2006, sixteen payments remained to be made under the Growth Plan. Of the sixteen payments remaining as of September of 2006, thirteen payments have become due as of the date of this opinion; the last three payments will become due on March 9, June 9, and September 9 of 2010.

To calculate the payments already due to Eggert, the Court multiplies thirteen payments by the adjusted payment amount of $25,906.47, for a total amount due of $336,784.12. The parties stipulate that between September of 2006 and the time of trial, Eggert received twelve payments of $12,530.78, for a total of $150,369.36. (Joint Ex. 8.) Subtracting the $150,369.36 already paid from the $336,784.11 due to Eggert yields an outstanding total of $186,414.76. Three more payments of $25,906.47 each will become due on March 9, June 9, and September 9 of 2010.

To calculate the payments already due to Nickell, the Court multiplies thirteen payments by the adjusted payment amount of $8,888.12, for a total amount due of $115,545.61. The parties stipulate that between September of 2006 and the time of trial, Nickell received twelve payments of $4,299.13, for a total of $51,589.56. (Joint Ex. 8.) Subtracting the $51,589.56 already paid from the $115,545.61 due to Nickell yields an outstanding total of $63,956.05. Three more payments of $8,888.12 each will become due on March 9, June 9, and September 9 of 2010.

## IV.    Conclusion

For the reasons discussed above, the Court finds that Defendant breached its contract with Plaintiffs, thereby damaging Plaintiffs in the amounts set forth below. Plaintiff Eggert

Agency Inc. is entitled to $187,706.50, payable immediately, as well as three payments of $28,614.54 each, due on March 9, 2010, June 9, 2010, and September 9, 2010, respectively. Plaintiff Mount Carmel Health System is entitled to $64,095.18, payable immediately, as well as three payments of $9,770.85 each, due on March 9, 2010, June 9, 2010, and September 9, 2010, respectively. Plaintiff James R. Eggert is entitled to $186,414.76, payable immediately, as well as three payments of $25,906.47 each, due on March 9, 2010, June 9, 2010, and September 9, 2010, respectively. Plaintiff Gregory R. Nickell is entitled to $63,956.05, payable immediately, as well as three payments of $8,888.12 each, due on March 9, 2010, June 9, 2010, and September 9, 2010, respectively. Each plaintiff's awarded amount shall be reduced by any payments received by that plaintiff from Defendant following the trial in this case. The Clerk is **DIRECTED** to enter judgment for Plaintiffs and against Defendant in this matter in the amounts set forth above.

      **IT IS SO ORDERED.**

i - dd - dolo

**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**

30